Okay, the next case, we'll just stick with the first name of Goodman v. Watkins. And, Mr. Ripplinger, when you're ready, please proceed. Thank you, Your Honor. May it please the Court. In this case, it did not become terribly clear to me why everyone seemed to believe, contrary to what my position has been in this case before, until I realized that there seems to be a very basic misunderstanding of law and property by not only the lawyers, but the judge involved in this case. As we go back, of course, the law of property follows the common law and has evolved since 1066-1. Back in the early days of common law, both wives and children were considered chattels in the property of the father-in-law. That has moderated somewhat. Now, we look at two different things. We look at property held by the individuals and earnings held by the two sides of this relationship. In the wife's case, her earnings are considered marital property now, the earned during the marriage. Similarly, the earnings of a minor during his minority are considered accessible to the parent because the parent has the concomitant obligation to support the minor. Property, however, which belongs to the wife either prior to the marriage or by gift or devise from some other party during the marriage is considered non-marital property. The same is also true of a minor. If a minor receives property that is not a result of the minor's earnings, then that is the minor's individual property and not accessible by either parent. And that's what we have in this case. In this case, the source of the funds that are in contention were life insurance proceeds in the life of Robert III's father, who died and made him his beneficiary. When that money became Robert III's, his mother had absolutely no right to it because it was not a result of his earnings. And the judge and all three lawyers, four lawyers in this case, didn't understand that quite obviously because the judge ordered some of that money being given to the mother from the gift card. And where we have a real problem here is when the trust was drafted, not only did it provide that mom, the parent, should receive some of the earnings of the separate property of the minor, she was also awarded some cash amounts from it immediately, and the trustee was given unlimited discretion to make further contributions to mom. In this case, the trustee not only paid out to mom most of the money, he also paid himself approximately $5,000 in attorney's fees without any supervision of the court or any request of the court, to the point where… There's $158,000? Pardon? $158,000? Yes, sir. How much is it now? Zero. Nothing? When we got into the case, there was absolutely nothing. They were unable to get reports from the trustee. When we finally got reports from the trustee and the trustee's books, quite frankly, there are some checks written out of the account and you couldn't even write down who got them. There's not much question of the liability of Mr. Watkins in this case. Unfortunately, he's uninsured, so that doesn't help us out a whole lot. Anyway, once we have that, what we have here is the motion to dismiss and the summary judgment were based upon another, what I consider, misconception, and that is that there was no duty on either of these lawyers to the minor. The first explanation is that there was no duty because the GAL had been appointed. There's no case law cited for that proposition. It's mainly because it's not true. It's not the law. The interesting part about it, if it were the law, and lawyers in situations such as this were relieved of any duty to that minor, the minor would have no recourse under the circumstances because Supreme Court has held that GALs have no liability for malpractice. That would mean that as soon as the GAL would be appointed that relieved the duty of the other lawyers involved in the case, the minor would be defenseless. He'd have no recourse no matter what happened to the situation, and that would be extraordinarily bad law, and I certainly would hope that this Court would not make it the law. Then we can expose that excuse. Then we look at what is the purpose of the litigation that was there. The purpose of the litigation was to appoint or determine who was going to be the guardian of the assets and the person of this child. The mother is the natural guardian of both of the person and the estate, and it appears in any kind of litigation of this nature that way. My son's litigation is going to drown me out today. So if we look at Mr. Cody, who claims that he represents a mom and has no obligation and no duty to that child, the proceeding is sorely mistaken because in this proceeding, the only thing this proceeding was about was the minor. The only purpose of these proceedings, no matter how they're determined, was what is the best interest of the minor, who is to be the best person to have custody of the minor's assets and safeguard them. There is no other purpose for any of these proceedings. Therefore, the mother appears in these proceedings in her natural position as the guardian of her child's estate and person. That means that her lawyer has a duty to represent her in that capacity in these proceedings, and since the minor is the only beneficiary, or should be the only beneficiary of these proceedings, his duty is naturally to that minor. In any dereliction of that duty, for example, as we allege in this case, drafting a trust agreement instrument, which would allow the mother to access the individual assets of this child for her own use, would be contrary to his duty and actually puts him in a conflict. Because if he is representing the mother as the guardian of the child, he cannot also represent the mother for her own individual interests. They're conflicting. As soon as he takes that position, and he did in fact take that position, that he saw his job as providing access of mom to the assets of the child. He stated such in his deposition. That is totally contrary to the purposes of these proceedings, which were to safeguard the assets, which were his individual assets, and not available to the mother. He failed miserably, and summary judgment should not have been granted. We should have been going forward with this case and let the jury decide whether he would have to pay damages as a result of the dereliction of duties. As to Judge Tagnarelli, technically he didn't even have to be there anymore since his petition was dismissed. And he makes that claim as relieving him of the duty, any duty he may have had. First, he claims he has no duty, but if he had a duty, he didn't leave with that because his petition had been dismissed. Well first, again, he filed a petition to have a guardianship established to protect the child's assets. There's no other reason for him to be there except to protect his child's assets. His responsibility and duty was to the child at all times. Secondly, when he continued his representation, even if he continued as a volunteer, he assumed the duty to continue that forward. His duty has always been the childhood beneficiary of these proceedings. We believe very strongly that the motion to dismiss should be set aside, as should the summary judgment in this case. Thank you. Mr. Nestor, do you wish to argue first? I will. May it please the Court? Michael Nestor, appearing on behalf of Judge Tagnarelli, Ms. Bonnie Lebo, and their former law firm of Tagnarelli and Lebo. The other day when I began thinking about what I was going to say to you this morning in oral argument, I was attempting to identify for myself a literary quote or phrase that would identify, summarize, or distill to its essence plaintiff's claim or cause of action against my clients in this case. Initially, I thought of Shakespeare because Shakespeare is Shakespeare. If you're going to cite a quote to the Court, especially a literary reference, you would cite Shakespeare. But the more I thought about it, the more I realized that I didn't quite understand what plaintiff's theory or cause of action or claim was against my client. And so I reread the briefs, and I finally realized that perhaps the best statement of plaintiff's claim against Judge Tagnarelli is found in the reply brief at page 2. And I quote, Richard Tagnarelli, Bonnie Lebo, and Tagnarelli and Lebo voluntarily assumed a duty to protect Robert Goodman and his estate after dismissal of the grandparents' petition for guardianship. Close quote. The reason why I believe that that's the best statement that I can find of plaintiff's claim against my clients is because 50% of plaintiff's reply brief was dedicated to that proposition. I find it curious and interesting that the statement contained in the reply brief is the best summary of plaintiff's claim because historically, if you review this case, you will realize that when plaintiff initially filed the claim with regard to the mismanagement of funds in 2005, my client was not even named as a party to the litigation, nor was there any allegation of assumption of a duty. That original complaint was filed, was amended by means of a first amended complaint, and again, my client was not identified as a party defendant, nor was there an allegation of an assumed duty. Finally, there was a second amended complaint filed, and for the very first time, my client, Judge Tagnarelli, was identified as a defendant. However, if you examine the second amended complaint, there still is no allegation of an assumption of a duty. Not on the trust agreement? Did he help drafting the trust agreement? Your Honor, if you examine, it's identified in the second amended complaint as count 10. It's actually count 13. There's a typographical error. But plaintiff in that count specifically alleges that my client, Judge Tagnarelli, was retained by Robert Goodman, the minor's grandfather, to represent him and a minor plaintiff. And so the allegation is a direct allegation of retention for legal services. It's not an assumption of a duty. It's a direct retention for legal services. And, Your Honor, there is no allegation or suggestion that the theory is one of assumption of a duty. And as I said, I think the only time that we get to that point is when we review the reply brief. And, Your Honor, that's important for a number of reasons. And that is, initially, there is no attorney-client relationship between my client, Richard Tagnarelli, the lawyer who is serving the grandparents. If we use the appellations, grandparents, mother, and minor, it's easier for us, at least it's easier for me, to understand and become oriented to the situation. But my client, Richard Tagnarelli, represented the grandparents. And a petition for guardianship was indeed filed. At no time, and a review of the probate file will demonstrate this, at no time did my client ever enter an appearance on behalf of the minor. Nor is there any court order that even remotely suggests or hints of that relationship. Indeed, if you look at the probate file more closely, the probate file demonstrates that there can be no attorney-client relationship between my client and the minor. The mother filed a motion to dismiss. And in the motion to dismiss, the mother recounts the divorce decree that was previously entered when she and her husband were divorced. And she identifies that in the divorce decree, she was deemed to be a fifth parent, entitled to joint custody, and indeed, at the time of her husband's death, had actual custody of the minor. Who's the trustee in this? Was that Watkins, was the trustee? He was the guardian and acted, I believe, as trustee as well. But, Your Honor, again with regard to the motion to dismiss, the mother also alleged that the grandparents did not even have standing to file the petition for guardianship because she was the natural mother and she had the superior right with regard to her child. And as a result of that, the court agreed with the motion to dismiss and dismissed the petition for guardianship. And so, there is no relationship of attorney-client, nor could there ever be under these circumstances. Because that theory failed, Plank then alleges another theory, and I'm not sure that it's actually properly alleged, but he makes this allegation or contention in the briefs that there has been an expansion in Illinois or an extension of the attorney-client privilege to third parties. That is literally true, but inapplicable to our case. The extension of the attorney-client relationship to third parties is extremely limited. The Pelham, Illinois Supreme Court case is directly on point, controlling and dispositive of our case. And in Pelham, the court said, we will only consider expanding or extending the attorney-client relationship to third parties if it's a non-adversarial relationship. And secondly, that's a situation similar to the drafting of wills for the benefit of intended beneficiaries there under. That's the scope and limitation of Pelham with regard to the attorney-client relationship applying to third parties. Those factors do not appear in this case. Because, as I've already indicated to the court, clearly there was an adversarial relationship between the grandparents and the mother with regard to this child, this minor. The third issue that arises is the lack of standing. When the petition for guardianship was dismissed, Mr. Cagnarelli had no further standing. He was not representing clients in the litigation. He may have been monitoring the litigation. He may have been curious as to what was transpiring in the litigation. He may have appeared because of a courtesy to the court. But he was not actively participating in the litigation because the only claim or stake that his clients had to participate was the petition for guardianship, which had been dismissed. And so, therefore, he had no standing to participate in the litigation. And by the way, remember that the mother raised the lack of standing issue as well, which in part resulted in the dismissal of the petition for guardianship. So because of the lack of standing, there could not be an attorney-client relationship between my client, Judge Cagnarelli, and the minor. What Mr. Riplinger or his client is suggesting to the court that is if an attorney appears in court not representing a litigant but simply monitoring a lawsuit, somehow, someway, an attorney-client relationship can attach to a third party who's involved in litigation. That smacks of some type of osmosis, which might be fine for scientific analysis, but certainly isn't the stuff of the law. It has to be, as everyone knows, a commitment of attorney to client because of the requirements of zealous advocacy and things of that nature, those principles of law. So it can't be haphazard or happenstance that creates the relationship. But yet, that's what plaintiff is arguing in this case. The other two points that I'll quickly make because my co-counsel has agreed to let me speak. Pardon? No, go ahead. One, really the fourth point is there cannot be any voluntary undertaking, which is set forth in the reply brief. And the reason for that is best noted in the reply brief itself because Mr. Riplinger concedes in the reply brief that Illinois has not recognized a voluntary undertaking with regard to the practice of law. And I believe that that's cited at page four of his reply brief, where he acknowledges Illinois has never expanded that doctrine to the situation we have here. Finally, with regard to the guardian ad litem situation, I would refer the court to the OCK case, which is cited in our appellate brief. And the OCK case stands for this proposition. Once appointed, the guardian ad litem is charged with defending the interest of the minor. We believe the appointment of the guardian ad litem bests that individual with exclusive authority to proceed on behalf of the minor in the pending lawsuit and operates to derogate and relieve any other person's authority to do so. So even assuming the worst case scenario for my client, that there was an attorney-client relationship, or somehow it was expanded to my client, or there was an assumption of the duty, none of which I believe exists. But in this particular case, the guardian ad litem was appointed, and the OCK case says that trunk case terminates, stops, any duty or obligation flowing from my client to the minor. For all those reasons, I would respectfully request that this court affirm the decision of Judge Gleeson and affirm the dismissal of my client's request. Thank you. Thank you. Mr. Kinzer? Thank you, Your Honor. May it please the court, Mr. Attorney General? Thank you. I am Jason Kinzer on behalf of Mr. Cody. I disagree strongly with Mr. Griplinger in this respect. I think that the court and the lawyers, with the notable exception of Mr. Watkins, got this case exactly right, at least insofar as the court decided to enter summary judgment in favor of Mr. Cody on plaintiff's malpractice and breach of fiduciary duty claims. Unfortunately, I don't have any Shakespearean quotes for the court, but what I do have is the 1982 Illinois Supreme Court Pelham case, which I think is directly on point in this matter. And I think a brief recitation of the facts of this case would be helpful here. In Pelham, a mother's children sued the mother's lawyer for malpractice, alleging that the mother's lawyer was negligent in failing to ensure that they received the proceeds of the father's policy of insurance. The lawyer had represented the mother in a dissolution proceeding, and then following on that there was the beneficiary's malpractice claim against the lawyer. The Illinois Supreme Court in Pelham found that as a matter of law, the mother's lawyer had no duty to the children, the beneficiaries. The court found that in order for that kind of duty to attach, in other words, in order for a lawyer to owe a duty to a non-client, there would have to be a finding that the contract of representation was entered into specifically and with the intent to benefit the third party, or to influence the third party in some way. In the Pelham case, the Supreme Court determined that because the dissolution proceeding was clearly adversarial in nature, that the mother's attorney could not devote a duty to the beneficiaries in that case. Had no duty to ensure that they received the benefits of the life insurance policy or anything else. In fact, it would have created a conflict for the mother's attorney to try to represent the children in that case. The court goes on to, I think importantly, to note that the court is free when they sense a potential conflict and when there's a minor whose interests are not being adequately protected by their current guardian or because it's adversarial, the court can elect to appoint a guardian ad litem, which is exactly what happened in this case. As the court's aware, Mr. Watkins was appointed as guardian ad litem to represent the interests of the plaintiff in the case. And I think it's also important to note that Mr. Watkins was appointed as guardian ad litem months before Mr. Cody ever entered an appearance on behalf of Mrs. Goodman. So when Mr. Cody comes to the case for the first time, Dennis Watkins has already been appointed the GAL. He's already filed pleadings in the trial court on the minor's behalf. And Mr. Cody, I think under the clear standards set forth in Pelham, which the facts are nearly identical to the facts in this case, could not have owed a duty to the plaintiff in this case. Had he attempted to represent both the minor and the mother simultaneously, he would have had a conflict, as I think Mr. Ripplinger acknowledges, which again is exactly why I believe the court appointed a guardian ad litem for the plaintiff in the first place. And then I would also note, as Mr. Nestor pointed out, that the Ott case clearly says that once a guardian ad litem is appointed, the appointment of the GAL divests any other person of authority to act on behalf of the minor. So again, when Mr. Cody entered an appearance on Mrs. Goodman's behalf in this case, with Mr. Watkins already having been appointed as GAL, not only could he have no duty to the minor plaintiff, he had no authority to act on the minor plaintiff's behalf, even if he wanted to. What Mr. Watkins did or didn't do is not Mr. Cody's duty. He had no duty to monitor Mr. Watkins. Contrary to what's asserted in the plaintiff's brief, he had no duty to vet Mr. Watkins to determine whether Mr. Watkins was a fit GAL. Again, Mr. Watkins had been appointed before Mr. Cody was ever on the scene, so even if there was such a duty, which there isn't, Mr. Cody wouldn't have had an opportunity to do that at any rate. And then finally, I'm probably running out of time, I think it's important to note that the plaintiffs also would be unable to put on any evidence of malpractice in this case, again, even assuming that a duty could be found to exist on Mr. Cody's part running to the plaintiff, because contrary to what the plaintiffs have argued, the trust agreement in this case that Mr. Cody drafted contained language giving the trustee discretion to distribute funds. That discretionary language, which is at the heart of the plaintiff's case here, was not only in the second draft of the trust, but it was in the first draft of the trust that the court approved. There was no request made of Mr. Cody to remove that language either by the court or by the guardian ad litem. The guardian ad litem, the court, and all the other attorneys in the case had the opportunity to review the final trust agreement. They approved it, and the language that the plaintiffs now take issue with was in the trust agreement the entire time. Finally, I'd like to point out with respect to the third part of our summary judgment argument that the plaintiffs have pled not only a legal malpractice claim, but also a breach of fiduciary duty claim. We've argued in the summary judgment motion, and I think this is correct, that those claims are duplicative. The plaintiff has argued that even if this malpractice claim had not been filed, that the breach of fiduciary duty claim would still be viable, because by virtue of the mother being the natural guardian of the child, Mr. Cody somehow had a duty to that child by virtue of the fact that he represented the mother. I think that as tenuous as that relationship may be, even assuming that that's a correct statement of how the law would impact this case, the rule announced in Pelham where it's clear that the attorney owes no duty to the children of the mother, unless the representation specifically contracted for it to benefit that third party, would clearly control. And so regardless of whether this is looked at as a malpractice claim or a breach of fiduciary duty claim, I don't think that under the law that we cited in the brief, Mr. Cody could be found to have a duty in either of those regards. So with that said, Your Honor, and subject to your questions, I would ask that the court confirm the trial court's grant summary judgment for Mr. Cody on counts 10 and 11 of the plaintiff's second degree. Okay. Thank you. Mr. Rittlinger, any rebuttal? Yes, sir. The defense raised the issue of adding Judge Tinelli late in the process. The reason for that is we were reluctant to bring a suit against a sitting judge when we had other defendants, until we found out that no other defendant had insurance or assets of any consequence. Judge Tinelli is insured, and we reluctantly added him. And so that's that. Saying that Judge Tinelli only monitored the process is really somewhat unfair. He, in fact, reviewed the document, commented on the document, and participated in its draft. That's a lot different than monitoring. And what was he monitoring for? He was monitoring for the benefit of the child. Also, when we talk about this being an adversary situation, and therefore the bond does not apply in those circumstances, it was only adversary between Grandpa and Mom. There was no adversarial relationship between them and the child. And they supposedly all had the same interest, which was to benefit the child. And in those circumstances, certainly this is a third-party beneficiary case that fits the mold. It's nowhere, nowhere any different. I'd also point out that the issue of whether he was relieved of his duties because the case was dismissed, that was first raised on appeal. It was not moved upon by the court. And, again, he voluntarily appeared. The State of Illinois has not applied voluntary undertaking to a legal malpractice case, but they have applied it to many other court cases. It's not a new theory in the State of Illinois. It just hasn't gotten to the emerging area of attorney malpractice, which is also a court case. And the odd case, I believe, if you read that, you will see that it does not hold that the appointment of the GAL relieves all the lawyers in the case of any responsibility. Thank you. Okay. Well, thanks to each of you for your arguments this morning, and we're going to take the matter under advisement, provide you with a decision on the earliest possible date. Thanks again. Thank you. And the next case is Nunn v. Hackman. Mr. Schroepfeldt, you're here by yourself today. We should notify that the appellant's counsel wished to waive argument. You also have the option of waiving oral argument, or you can proceed if you wish to. Yes, sir, it is. May it please the Court. Chris Schroepfeldt for the petitioner. Rebecca Nunn, and this is a case arising out of the Domestic Violence Act of 1986, a border protection case that was brought by my client against her ex-fiancé, Mr. Hackman. What the court found and what the trial court found was that there was no inconduct, it was not reasonable, and it was intended to cause emotional distress to my client. Conduct itself did cause emotional distress to my client, and on the basis of the evidence that was presented, the court made the finding of abuse and entered the plenary order of protection. Some of the arguments that were made in Mr. Hackman's brief were that there was no such finding. However, the court examines the order itself. It does make, under the section entitled findings, that the petitioner has been abused and that the order of protection is necessary to discontinue any further abuse of the petitioner. So I think the real argument that the respondent had was that there was a lack of evidence showing that the finding should have been made. But the court itself did discuss the evidence that was presented at the trial level, and he noted that this was not a typical case that he had seen before. However, he acknowledged that he was struggling with some of the issues. However, he did find that the evidence supported a finding of abuse and issued the plenary order of protection. I don't think that, based upon the standard of review, that this court should overturn that finding. There doesn't seem to be any basis to do that. I don't know if the court has any questions about the facts that were involved in this case. It was a fairly brief hearing. It took about a morning. It involved, as my client alleged, one of the videos that was taken that was taken without her consent. Some of the other videos were taken with her consent as the court found. However, upon the breakup of the engagement, the videos were then posted to a website, and Mr. Hackett alerted his 3,200 Facebook friends to where they could go to find these videos. In addition, my client talked about him showing up at her house uninvited, locking herself in the bathroom because he wouldn't leave when he was requested to do so. She also discussed an incident at the community college where she was attending classes where he showed up, and she had to get some of her friends to accompany her to her car to keep him away from her, and another incident where she was going to be at a modeling shoot for a calendar down at Lake of the Ozarks, and he made text threats to her saying that if she were to show up there, he would be there, and he would be distributing pictures that she wouldn't like to have distributed. She didn't go to the event, and she said she was scared and felt frightened by him. So that was the basics of the evidence that was given. He testified that it was his intent to cause emotional distress, so I don't think there's any problems with the findings of the abuse in this case. We're okay. Thank you, and we appreciate you appearing for oral argument. We'll take the matter under advisement and try to issue a decision at the earliest possible date.